IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.,* | : : : : | Chapter 11<br><br>Bankr. No. 19-11466 (MFW) |
| Debtors. | : | (Jointly Administered) |

_____

| | | |
|---|---|---|
| CENTER CITY HEALTHCARE, LLC, d/b/a HAHNEMANN UNIVERSITY HOSPITAL, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, ST. CHRISTOPHER'S HEALTHCARE, LLC, and SCHC PEDIATRIC ASSOCIATES, LLC, | : : : : : : : : | <br><br><br><br><br><br>Adv. No. 21-50920 (MFW) |
| Appellants,<br>v. | : : : | |
| MEDLINE INDUSTRIES, INC., | : : | Civ. No. 24-1019 (CFC) |
| Appellee. | : : | |

_____

John D. Demmy, Monique DiSabatino, Saul Ewing LLP, Wilmington, Delaware,

    *Counsel for Appellants*

Eric Daucher, Robert M. Hirsh, Norton Rose Fulbright US LLP, New York, New York; Frederick B. Rosner, Zhao (Ruby) Liu, The Rosner Law Group LLC, Wilmington, Delaware,

    *Counsel for Appellee*

## **OPINION**

November 17, 2025
Wilmington, Delaware

_Cohn F. Connolly_

CHIEF JUDGE

## I.    INTRODUCTION

This appeal arises in the chapter 11 cases of Center City Healthcare, LLC and certain affiliates ("Debtors")[1] in connection with an adversary proceeding brought by the Debtors against appellee Medline Industries, Inc. ("Medline") seeking, *inter alia,* the avoidance and recovery of certain transfers made by the Debtors to Medline totaling $4,393,024.56 during the 90-day period prior to the commencement of the chapter 11 cases—April 1 through June 30, 2019 ("Preference Period")—pursuant to section 547 of the Bankruptcy Code.  Following discovery, Medline moved for summary judgment.  By order dated August 27, 2024 (Adv. D.I. 82) ("SJ Order"), the Bankruptcy Court granted summary judgment in favor of Medline on all claims for the reasons set forth in its accompanying opinion, *In re Center City Healthcare, LLC,* 664 B.R. 208 (Bankr. D. Del. 2024) ("SJ Opinion").  The Debtors have appealed the SJ Order.  For the reasons set forth herein, the SJ Order will be affirmed.

## II.    BACKGROUND

### A.    The Parties

Tenet Business Services Corporation ("Tenet") operated Hahnemann University Hospital and St. Christopher's Hospital for Children, two large

---

[1] The Debtors are Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("CCH"), Philadelphia Academic Health System, LLC ("PAHS"), St. Christopher's Healthcare, LLC ("SCH"), and SCHC Pediatric Associates, LLC ("SCHC").

hospital systems in Philadelphia, since 1998. (A.122–30.)[2] On January 11, 2018, the

Debtors acquired these operating assets from Tenet. (*Id.*) Prior to the acquisition,

Medline provided medical supplies to Tenet. (A.131–49.) Following the acquisition,

and prior to the Preference Period, Medline continued to provide supplies to the

Debtors. (A.150–54.) The record supports a finding that Medline eventually grew

concerned about extending credit to the Debtors, and that it enforced its credit terms

both prior to and during the Preference Period, by, among other things, demanding a

non-debtor parent guaranty, requiring wire payments when payments historically had

been sent by check, and modifying payment and shipping terms. (*See* A.155–58;

A.163–70; A.181–84; A.214–19, A.172–78); A.227–28; A.366–99.)

## B. The Chapter 11 Cases and the Summary Judgment Motion

On June 30, and July 1, 2019 (the "Petition Date"), the Debtors commenced

their chapter 11 bankruptcy cases. On June 25, 2021, the Debtors filed the adversary

proceeding against Medline (B.1–51) (the "Complaint"). Count One of the

Complaint seeks the avoidance and recovery of 12 payment transfers totaling

$4,393,024.56 (the "Transfers") made to the Medline during the Preference Period

pursuant to section 547 of the Bankruptcy Code.

---

[2] The appendix (D.I. 13) filed in support of the Debtors' opening brief is cited herein as "A.__," and the appendix (D.I. 15) filed in support of the Medline's answering brief is cited herein as "B.__."

After the close of fact and expert discovery, on November 17, 2023, Medline filed a motion for summary judgment (B.52–53) and brief in support (B.54–69) (the "MSJ"). The Debtors filed their response on December 12, 2023 (B.448–99) ("Response"). Medline filed its reply on December 29, 2023. (B.500–20.)

It is undisputed that the Debtors established a *prima facie* case for avoidance of the Transfers under section 547(b).[3] (B.471.) The Bankruptcy Code provides certain defenses to such avoidance actions. *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 219 (3d Cir. 1994) *superseded, in part, by statute*, Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, P.L. 109-8, Title IV, § 409, 119 Stat 23 (Apr. 20, 2005). Medline asserted two defenses: (1) that its preference liability is reduced by $1,297,376.50 under the objective ordinary course defense set forth in section 547(c)(2)(B) of the Bankruptcy Code; and (2) that the remaining liability of

---

[3] A bankruptcy trustee may avoid a debtor's prepetition transfer of a debtor's property if the following elements of § 547(b) are met: (1) the transfer was made to or for the benefit of a creditor, (2) on account of a preexisting debt, (3) while the debtor was insolvent, (4) within 90 days of the debtor's bankruptcy filing, and (5) the transfer enabled the creditor to receive more than it otherwise would in a hypothetical chapter 7 case. 11 U.S.C. § 547(b). The Bankruptcy Code presumes that the Debtors were insolvent during the preference period. 11 U.S.C. § 547(f). Medline did not dispute the amount of the Transfers during the Preference Period or contest that the Debtors were insolvent during that period. (B.70–81 (Medline's Statement of Undisputed Material Facts) ("SUMF") at ¶¶ 13–36, 64–65.)

$3,095,648.06 is eliminated by the subsequent new value defense set forth in section 547(c)(4) of the Bankruptcy Code.

### 1.  Medline's Objective Ordinary Course of Business Defense

Medline asserted that a portion of the Transfers are exempt from avoidance under the ordinary course of business defense contained in section 547(c)(2), which provides:

> (c) The [debtor] may not avoid under this section a transfer –
> ...
> (2) to the extent that such transfer was in *payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee*, and such transfer was
>
> > (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> >
> > (B) *made according to ordinary business terms.*

11 U.S.C. § 547(c)(2) (emphasis added).  Medline relied on subsection (B), which is referred to as the "objective" ordinary course test, and which requires the court to consider whether each transfer was "made according to ordinary business terms." "[O]rdinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships." *In re Molded Acoustical*, 18 at 223–24.  On the other hand, the "subjective" ordinary course test identified in subsection (A) requires "each fact pattern [to] be examined to assess 'ordinariness' in the context of the relationship of the parties over time." *In re Hechinger Inv. Co. of Delaware, Inc.,* 489 F.3d 568, 576–77 (3d Cir. 2007).

In support of its objective ordinary course defense, Medline submitted the declaration of an expert, Vincenzo Toppi, a partner with CohnReznick (B.222–27) ("Toppi Decl.").   In order to assess to what extent payments to Medline were made on ordinary business terms, Mr. Toppi compared the number of days that it took the Debtors to pay Medline's invoices against the range of days for payment by companies in the same industry and of similar size.  (B.223–24, Toppi Decl., ¶¶ 2–4.) To determine the "days to pay" Medline's invoices, Mr. Toppi reviewed Medline's business records and the Medline "statement of account" that was attached to the Complaint.  (A.508–17.)  To determine the industry standard "days to pay," Mr. Toppi relied on data compiled by Risk Management Association ("RMA") with respect to companies similar to Medline during the relevant time period.[4]  (Id.)  In particular, Mr. Toppi reviewed data of 13 companies with greater than $100,000,000 in assets and greater than $25,000,000 in annual sales that fell within the "Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers" industry— North American Industry Classification ("NAIC") industry code 423450 (the "Relevant Industry").  (B.76–77, SUMF ¶¶ 51–57; B.223-24, Toppi Decl. ¶¶ 2–3; B.110–111, Reed Decl. ¶¶ 4–11.)  The data showed that the ordinary course "days to pay" in the relevant industry ("Industry Range") during the Preference Period was 28

---

[4] Medline also presented the declaration of its Director of Credit, Shane Reed (B.109-221) ("Reed Decl."), who stated that he and other professionals in the industry rely on the data compiled by RMA in making credit decisions.  (B.110 & B.114–17.)

to 76 days. (B.76–77, SUMF ¶¶ 51–57; B.110–11, B.115, Reed Decl. ¶¶ 4–13, Ex. 4 at 1.) Mr. Toppi's analysis showed that payments totaling $1,297,376.50, fell within that range. (B.78–79, SUMF ¶¶ 58–61, 64; B.226, B.372, Toppi Decl. ¶ 20, Ex. 7 at 104.) Notably, $3,095,648.06 worth of the Medline invoices paid by the Transfers fell outside the RMA Industry Range and thus outside of the objective ordinary course defense. (B.79, SUMF ¶ 65; B.226, B.372, Toppi Decl. ¶ 20, Ex. 7 at 104.)[5]

### 2.    Medline's Subsequent New Value Defense

Medline asserted that even assuming $3,095,648.06 worth of the Medline invoices paid by the Transfers fall outside of the objective ordinary course defense, the new value Medline provided during the Preference Period still reduced Medline's preference liability to $0. Medline supplied the Debtors with new goods throughout the Preference Period, as evidenced by invoices from Medline to Appellants ("New Value Invoices") totaling $4,064,050.97. (B.226, B.372, B.447; Toppi Decl. ¶¶ 20–21; Ex. 7 at 104, Ex. 8 at 74.)

The "new value" defense set forth in section 547(c)(4)[6] of the Bankruptcy Code reduces a creditor's preference exposure to the "net result of the preferential

---

[5] The record reflects that available RMA data extended several months beyond the Preference Period used in Mr. Toppi's analysis. Had the longer period been used, data from more comparable companies would have been available and the Industry Range would have expanded to 27 to 110 days to pay, protecting still more of the payments to Medline. (B.223, Toppi Decl. at n.3.)
[6] Section 547(c)(4) provides that:

transfers and subsequent new value (paid and unpaid)." *In re Proliance Int'l, Inc.*, 514 B.R. 426, 438 (Bankr. D. Del. 2014).[7]  In support of its new value defense, Medline was only required to "track the debits and credits generally" to identify the "net result." *In re Sierra Concrete Design, Inc.*, 463 B.R. 302, 307 (Bankr. D. Del. 2012).  Although Medline was not required to "link specific invoices to specific payments," *id.*, Medline did provide such an analysis which subtracted—on an invoice-by-invoice basis in sequential order—the amounts of New Value Invoices reflecting new shipments of goods to the Debtors from the Transfers not covered by the objective ordinary course of business defense.  (B.226, B.372, B.447; Toppi Decl. ¶¶ 20–21; Ex. 7 at 104, Ex. 8 at 74.)  The "net result" of this analysis was $0.  In other words, Medline contended, the balance of the Transfers not shielded by the objective ordinary course defense was shielded from avoidance based on the amount of new value provided.

---

(c) The [debtor] may not avoid under this section a transfer —

> ...
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor —
>
>> (A) not secured by an otherwise unavoidable security interest; and
>> (B) on account of which ***new value the debtor did not make an otherwise unavoidable transfer*** to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4) (emphasis added).

[7] New value means "money or money's worth in goods, services, or new credit . . . that is neither void nor voidable by the debtor or the trustee under any applicable law." *In re Proliance Int'l, Inc.*, 514 B.R. at 431.

C.    **The Debtors' Response in Opposition to Summary Judgment**

With respect to the objective ordinary course defense, the Debtors argued that

the SJ Motion singularly focused on an average "days to pay" range analysis and

ignored the Medline's behavior during the Preference Period. (B.471–72.)  Without

citing any expert evidence, the Debtors asserted that Medline's collection efforts

during the Preference Period were extraordinary and, therefore, fall outside of what

should be considered ordinary business terms. (B.448.)  Medline's conduct "is

similar to that which the Third Circuit considered crucial in *Molded Acoustical* and

requiring analysis of the parties' full relationship and behavior in the Preference

Period," the Debtors asserted. (B.474).  The Debtors further argued that the RMA

data on which Medline relied in proffering the Industry Range was inadmissible

hearsay, improperly limited, contained outliers, and lacked reliability. (B.456–57.)

Based on their assertion that the objective ordinary course defense did not

shield any of the Transfers, the Debtors argued that Medline's new value defense was

insufficient to shield all Transfers from avoidance. (B.485.)  The Debtors further

contended that the new value analysis prepared by Mr. Toppi contained several

errors. (Adv. D.I. 73 at ¶¶ 4–10; Adv. D.I. 75 at Ex. 82.)  The Debtors submitted the

declaration of Susannah Prill (A.1–A.58) ("Prill Decl."), a CPA and director of the

Debtors' financial advisor Eisner Advisory, who assessed that the Bankruptcy Court

must deduct from the alleged new value certain service charges (totaling $26,415.22),

misnumbered invoices (totaling $210,053.87), and certain new value provided outside of the Preference Period (totaling $539,523.93). (Prill Decl. ¶¶ 4–10.) Even accepting these errors, however, the Debtors conceded that Medline's new value defense shielded all except approximately $1 million in preference liability. (A.500 (showing $1,076,557 remains of net preference liability after subtracting new value).)

### D.     The SJ Opinion and SJ Order

The Bankruptcy Court granted summary judgment to Medline as to all of the Transfers, finding that Medline "presented admissible, reliable, and sufficient evidence to establish that $1,297,376.50 of the alleged preferential transfers made by the Debtors to the Medline were made according to ordinary business terms in the industry." *In re Center City Healthcare*, 664 B.R. at 217. As set forth in the thorough MSJ Opinion, the Bankruptcy Court determined that: the RMA data was admissible under the hearsay exception of Federal Rule of Evidence 803(17) (*see id.* at 213–14); the expert methodology used by Mr. Toppi was sufficiently reliable to demonstrate the industry standard (*see id.* at 214–15); and "any evidence of [Medline's] collections activity, even if extraordinary or unusual, is not relevant to the objective ordinary course of business defense (*id.* at 217). The Court explained:

> The Debtors' reliance on the *Molded Acoustical* case is
> misplaced. That case was decided prior to the 2005
> amendments to section 547(c), at a time when a defendant had
> to prove that its relationship with the debtor satisfied <u>both</u> the
> subjective and the objective tests. The Debtors provide no
> authority for the proposition that bankruptcy policy demands

> that the Court import the subjective analysis into the objective
> one. Further, that argument is contra to the express language
> of the statute which provides a defense if the Defendant can
> show that the parties acted <u>either</u> in the ordinary course of
> their own business dealings <u>or</u> in the ordinary course of
> business dealings in the industry.

*Id.* at 217. The evidence was likewise sufficient to establish that the balance of

Medline's liability was shielded from avoidance by subsequent new value:

> The Defendant presented credible evidence that it provided
> new value to the Debtors of $4,064,050.97. This is more than
> sufficient to cover the preferential transfers of $3,095,648.06
> remaining after application of the ordinary course of business
> defense. Even if the Court were to accept the assertions of
> Ms. Prill and deduct the service charges ($26,415.22), mis-
> numbered invoices ($210,053.87), and new value provided
> outside the preference period ($539,523.93), the new value
> provided by the Defendant is still sufficient to cover all of the
> remaining alleged preferential transfers. Therefore, the Court
> finds that the Debtors' evidence is insufficient to rebut Mr.
> Toppi's evidence of new value or to create a genuine issue of
> material fact.

*Id.* at 219 (citing B.226, Toppi Decl. at ¶ 21; B.447, Toppi Decl., Ex. 8 at 74).

### E.    The Appeal

On September 9, 2024, the Debtors filed a timely notice of appeal. D.I. 1. The

appeal is fully briefed. D.I. 12, 14, 16, 17. No party requested oral argument.

## III.   JURISDICTION AND APPLICABLE STANDARDS

An order granting summary judgment on all counts is a final order. This Court

has jurisdiction over the appeal pursuant to 28 U.S.C. § 158. In reviewing a

bankruptcy court's grant of summary judgment, which is "a purely legal

determination," the district court applies a plenary, or *de novo* standard of review.

*See In re Abeinsa Holding Inc.*, 653 B.R. 713, 717 (D. Del. 2023) (citing *Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir. 1999)).

Even on a decision arising from a motion for summary judgment, a trial court's decision to admit (or reject) expert testimony is reviewed for abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43 (1997) (holding that the admissibility of expert testimony is reviewable under an abuse-of-discretion standard on a motion for summary judgment); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 388 (D. Del. 2014) ("The Third Circuit has explained that on appeal it 'afford[s] a district court's application and interpretation of [Federal] Rule [of Evidence] 702 plenary review,' but 'review[s] the [trial] court's decision to admit or reject testimony under an abuse of discretion standard.'" (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (internal citations omitted)). A court "abuses its discretion" if "its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or the improper application of law to fact." *Id.* (quoting *Ragguette v. Premier Wines & Spirits*, 691 F.3d 315, 322 (3d Cir. 2012)). An abuse of discretion can also occur when "no reasonable person would adopt the district court's view." *Id.* (citing *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 192 (3d Cir. 2000)). Finally, the Court will not interfere with the trial court's exercise of discretion "unless there is a

definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (cleaned up).

As the party moving for summary judgment, Medline was required to present evidence sufficient to support its contention that "there is no genuine dispute as to any material fact and [that Medline] is entitled to judgment as a matter of law" that the Transfers are unavoidable. Fed. R. Civ. P. 56. A party asserting that a fact cannot be—or alternatively is—genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## IV.  ANALYSIS

### A.  Medline's Objective Ordinary Course Defense[8]

Section 547(c)(2)(B) renders a transfer unavoidable to the extent it was: (1) "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee" and (2) "made according to **ordinary business terms**."  11 U.S.C. § 547(c)(2)(B) (emphasis added).

The objective test "focuses on general norms within the creditor's industry." *In re AES Thames, LLC*, 2016 WL 11595116, at *6 (Bankr. D. Del. Oct. 28, 2016). As noted, the Third Circuit has advised that "ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships."  *In re Molded Acoustical*, 18 F.3d at 223-24.  In other words, a creditor cannot establish the industry norm by

---

[8] As the Third Circuit has explained, the statutes are intended to strike a balance between two conflicting policies:

> On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.

*In re Molded Acoustical*, 18 F.3d at 219-220 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6138).

arguing that its terms match how the industry treats other financially challenged debtors. *See id.* That said, courts in this District agree that this is "not an exacting standard," *In re Powerwave Techs, Inc.,* 2017 WL 1373252, at *8 (Bankr. D. Del. Apr. 13, 2017), and that the evidentiary burden on the defendant to establish an objective ordinary course defense is "not formidable." *Sass v. Vectour Consulting, Inc. (In re Am. Home Mortg. Holdings, Inc.*), 476 B.R. 124, 141 (Bankr. D. Del. 2012) ("the creditor is not required to prove rigorous definitions of either the industry or the credit standards within that industry.")  To the contrary, "ordinary business terms" refer to "the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of the [exception]." *In re Molded Acoustical*, 18 F.3d at 220 (quoting *In re Tolona Pizza,* 3 F.3d 1029, 1033 (7th Cir. 1993) (emphasis in original)).  For purposes of making these comparisons, a defendant is given "considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be 'unusual' remain within [the exception]." *In re Molded Acoustical*, 18 F.3d at 220.  In essence, if a transfer falls somewhere within the broad range of credit practices that exist in the generally comparable industry, it is protected by the objective ordinary course defense.

This stands in contrast to the "subjective" ordinary course test set forth in section 547(c)(2)(A), which "call[s] for the Court to consider whether the transfer was ordinary as between the debtor and creditor," *Am. Home Mortgage.*, 476 B.R. at 135–36, and requires that "each fact pattern [] be examined to assess 'ordinariness' in the context of the relationship of the parties over time." *In re Hechinger,* 489 F.3d at 576-77. As part of this inquiry, courts consider a myriad of factors including: (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfers were in amounts more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition. *In re Hayes Lemmerz Int'l, Inc.*, 339 B.R. 97, 106 (Bankr. D. Del. 2006). No single factor is determinative. *In re Conex Holdings, LLC,* 518 B.R. 269, 280 (Bankr. D. Del. 2014).

### 1.    Medline Presented Evidence Sufficient to Support Judgment as a Matter of Law

"[T]he applicable industry standard is to be ascertained based on the credit arrangements of other debtors and creditors in a similar market." *In re AES Thames, LLC*, 2016 WL 11595116, at *10. Other courts have determined that data from the Risk Management Association is reliable. *Id.* at *9. In *AES Thames*, where the

"number of days between invoice date and payment date" between the parties "fell within the payment range" of the applicable RMA data, the Bankruptcy Court concluded that the transfers at issue fell "within ordinary business terms." *Id.* at *10.

Medline's contention that at least $1,297,376.50 of the Transfers fell within industry standards was well supported by the record. The data compiled by Medline's expert showed that the "days to pay" in the Industry Range during the Preference Period was 28 to 76 days. (B.76–77, SUMF ¶¶ 51-57; B.110–111, B.115, Reed Decl. ¶¶ 4-13, Ex. 4 at 1.) Mr. Toppi's analysis showed that certain Transfers totaling $1,297,376.50 fell within that range and were thus protected. (*Id.*) The Bankruptcy Court concluded that the expert methodology used by Mr. Toppi was sufficiently reliable to demonstrate the industry norm.

I agree. The Third Circuit has held that the standard for determining ordinary business terms "though still requiring that the creditors make some showing of an industry standard, is quite accommodating." *In re Molded Acoustical*, 18 F.3d at 224. "That accommodating and flexible approach to establishing an industry standard for ordinary business terms warrants acceptance of Mr. Toppi's conclusions that the RMA data is sufficient to establish the industry range of 'days to pay' without further analysis." *In re Center City Healthcare*, 664 B.R. at 215.[9]

---

[9] The Debtors assert that "the Bankruptcy Court incorrectly allowed Medline to use its own customer dealings to establish an industry standard," which "only reflects Medline's internal practices, not the prevailing norms in the broader industry."

### 2.    The Debtors Failed to Dispute Medline's Evidence or Otherwise Show a Genuine Issue for Trial

Where, as here, the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).  As the Bankruptcy Court observed with respect to the industry standard put forth by Medline, "the Debtors have not rebutted any of Defendant's evidence on this point." *In re Center City Healthcare,* 664 B.R. at 215.

The Debtors failed to dispute[10] Medline's choice of industry data in referencing the RMA data.  (*See* B.77, SUMF ¶¶ 55; B.539–41 at Tr. 113:10–114:4, 114:24–115:15).  To the extent asserted by Medline, the Debtors' expert admitted the timing of payments to Medline fell within industry norms.  (*See* B.82–108 ("Kaplan Decl."), at B.105–07 (Debtors' expert agreed that, late in the Preference Period, payment timing "moved towards industry standard"); B.97–99 (Expert Rebuttal Report of William Pederson confirming that "all the invoices dated after [March 22, 2019]"

---

D.I. 12 at 34.  While Medline did provide such an analysis in support of its MSJ Motion, the Bankruptcy Court made clear in the MSJ Opinion that it was not considered.  *See In re Center City Healthcare*, 664 B.R. at 216 n.51 ("[b]ecause the Court does not rely on that evidence, it is unnecessary to address this issue").

[10] The Debtors purported to generally oppose Medline's statement of undisputed material facts without reference to supporting materials in the record.  (*See* B.449, Response ¶ 2; Fed. R. Civ. P. 56(e)(2).)

were paid within the Industry Range and the transactions between the parties "moved toward industry standard during the preference period.").

With respect to Debtors' burden to come forward with specific facts showing that there is a genuine issue for trial, the Debtors presented no industry analysis of their own. Rather, Debtors argue that Medline's SJ Motion was insufficient to demonstrate "ordinary business terms" as a matter of law because Medline's evidence was based on one statistical metric—the age ranges of invoices paid by each Transfer—and failed to establish that its "extraordinary collection efforts" during the Preference Period were also typical for the industry. *See* D.I. 12 at 14-20. Because Medline "did not present sufficient evidence of relevant industry standards with respect to credit, payment and shipment practice," the Debtors argue, Medline was not entitled to summary judgment. *Id*. at 20. The Bankruptcy Court properly rejected this argument. *In re Center City Healthcare*, 664 B.R. at 217.

First, the objective ordinary course defense may be satisfied based entirely on a days-to-pay analysis. *See In re AES Thames, L.L.C.*, 2016 WL 11595116, at *10 (relying on expert reports analyzing days to pay in the relevant industries to establish the objective ordinariness of the transactions); *In re ASPC Corp.*, 658 B.R. 455, 467 (Bankr. S.D. Ohio 2024) (finding that "the evidence that would have best shown that the Transfers satisfied the objective test would have compared the timing of firearm wholesalers' payments to firearm manufacturers to the timing of [debtor's] payments

to [creditor]" and holding that expert's analysis of days sales outstanding was

sufficient to establish the objective ordinariness of the transactions); *see also In re*

*AFA Inv. Inc.*, 2016 WL 908212, at *5 (Bankr. D. Del. Mar. 9, 2016) (evaluating

objective ordinary course defense based on expert reports assessing "the average days

that receivables were outstanding" based on RMA data, but concluding experts

referenced incorrect date range).

      The decision in *In re AES Thames* is instructive here.  There, a debtor sued a

supplier with which it had a relatively short business history to avoid and recover

certain preferential transfers.  *Id.* at *2, 11.  The defendant moved for summary

judgment based on, among other things, the objective ordinary course defense

supported by an expert declaration that was focused entirely on a "days to pay"

analysis, based entirely on a combination of the defendant's business records and data

from RMA.  *Id.* at *6-7, 12.  The defendant's expert went on to explain that "RMA

data establish industry standards on payment practices" and that the payments to the

defendant "fell within the average payment range for each relevant industry, and,

therefore, were made in accordance with ordinary business terms and are not

avoidable."  *Id.* at *7.  Over objections that closely track those advanced by the

Debtors here, the court in *In re AES Thames* admitted the expert report and found that

the days-to-pay analysis provided therein was sufficient to establish an Objective

Ordinary Course Defense, declaring:

> 'Precise data is not necessary to prove ordinary business
> terms within a creditors' industry.' While it may not be
> precise, I find the expert's reliance on the RMA data to be
> reasonable and appropriate here. On the record before me, I
> conclude that [defendant] has demonstrated that the
> Transfers fall within ordinary business terms.

*In re AES Thames*, 2016 WL 11595116 at *10 (quoting in part *In re American Home*

*Mortg.*, 476 B.R. at 141 (citing *Hechinger Liquidation Trust v. James Austin Co, (In*

*re Hechinger Inv. Co. of Delaware, Inc.)*, 320 B.R. 541, 550 (Bankr. D. Del. 2004)).

In short, the court in *In re AES Thames* found that (1) a "days to pay" analysis is

sufficient to establish an objective ordinary course defense and (2) RMA data

selected for an appropriate industry is sufficient to "establish industry standards on

payment practices" to the extent required for that defense. *See id.* at *7-10. The

Bankruptcy Court's determination that the RMA data-based analysis was sufficiently

reliable to demonstrate the industry standard, and therefore establish the objective

ordinariness of the transactions when compared to the information available, is

consistent with *In re AES Thames*.

Second, the Debtors assert that "extraordinary collection efforts … disqualify a

creditor from relying on the [objective] ordinary course [d]efense" but offer no

evidence and point to nothing in the record showing that Medline's collection activity

was "so idiosyncratic as to fall outside the broad range" of industry norms. D.I. 12 at

17. Assuming that "extraordinary collection activity" may defeat an objective

ordinary course defense,[11] the Debtors did not present any evidence that Medline's conduct was, in fact, extraordinary. Although they had the opportunity to do so, the Debtors offered no expert evidence of their own to establish that any of Medline's conduct was out of line with industry norms. Nor did the Debtors adduce any such testimony from Medline's witnesses. Debtors essentially argue that where, as here, there was any collection activity at all, the transfers that followed necessarily fall outside of ordinary business terms which "prevail in healthy [] creditor-debtor relationships," regardless of whether those transfers ***still fall within an objective industry norm***, such as the "days to pay" range. This argument seems at odds with the proposition that the industry standard is necessarily defined as a "range of terms," and that establishing an industry norm is "not an exacting standard." The Third Circuit has explained that the burden to establish "ordinary business terms"

> does not imply that the creditor must prove the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausibly argue comprise the relevant industry.

*In re Molded Acoustical,* 18 F.3d at 223–24. Instead, ordinary business terms "refers to the *range* of terms that encompasses the practices in which firms similar in some

---

[11] The Bankruptcy Court held that "any evidence of the Defendant's collection activity, even if extraordinary or unusual, is not relevant to the objective ordinary course of business defense." *In re Center City Healthcare,* 664 B.R. at 217.

general way to the creditor in question engage ..." *In re Molded Acoustical,* 18 F.3d at 223–24 (quoting *Tolona Pizza,* 3 F.3d at 1033 (emphasis in original).

The Debtors also cite *FI Liquidating Trust v. C.H. Robinson Company, Inc. (In re Fred's Inc.),* 2025 WL 208536 (Bankr. D. Del. Jan. 15, 2025), which discusses the SJ Opinion. *See id.* at *8–9. The Debtors argue that decision "is instructive ... on the continued post-BAPCPA viability of the Third Circuit's decision in *In re Molded Acoustical.*" D.I. 17 at 2. In *In re Fred's Inc.,* as here, the court considered a creditor's argument that the transfers it received from the debtor were made according to "ordinary business terms" and thus exempt from avoidance. *In re Fred's Inc.,* 2025 WL 208536, at *7. Unlike the case here, however, the creditor in *In re Fred's Inc.* based this argument primarily on a declaration seeking to establish that "it is common in the transportation and logistics industry for a supplier to tighten credit terms once it becomes clear that a customer is facing financial difficulty." *Id.* at *7. The court rejected this evidence based on guidance from *Molded Acoustical* that ordinary business terms—for purposes of establishing the industry norm—"are those that prevail in healthy [] creditor-debtor relationships." *Id.* at *7 (citing *In re Molded Acoustical,* 18 F.3d at 227. And while the creditor there cited the MSJ Opinion in support of its argument that ordinary business terms include terms that are ordinary in light of the debtor's financial condition, the court labelled this as "a misreading" of the MSJ Opinion. *Id.* at *8.

I agree.  Here, consistent with *In re Molded Acoustical*, Medline put forward RMA data based on healthy creditor-debtor relationships, which the Bankruptcy Court found sufficient to establish an industry norm for "days to pay" and to show that certain of the Transfers were objectively ordinary—that those Transfers fell within the range of terms that encompass "the practices in which firms similar in some general way to the creditor in question engage"—*i.e.,* payment within 28 to 76 days.  Having failed to come forward with specific facts disputing the Industry Range, or to present evidence showing Medline's credit enforcement was so idiosyncratic as to fall outside the broad range of terms on which similar firms engage, the Debtors cannot be said to have raised a genuine issue of material fact that would allow a trier of fact to return a verdict in their favor.

### 3. The Bankruptcy Court Did Not Abuse its Discretion by Admitting Mr. Toppi's Expert Analysis Based on RMA Data

The Debtors argue that the Bankruptcy Court abused its discretion by admitting Mr. Toppi's expert analysis because (1) the RMA data is inherently unreliable in the context of establishing an objective ordinary course defense; and (2) the RMA data was inadmissible hearsay.  *See* D.I. 12 at 24–30, 33–34.

As the Third Circuit has emphasized, "[t]he Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact."  *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), *as amended* (Dec. 12, 1997); *see also In re AES Thames*, 2016 WL

11595116, at *7 ("The Third Circuit joins other jurisdictions in taking a liberal view on the admission of expert testimony").

With respect to the Debtors' first argument, the Bankruptcy Court properly found that the RMA data was reliable for establishing an ordinary course defense. Here, Mr. Toppi's expert testimony as to the industry standard was based on RMA data, which other courts have repeatedly recognized as reliable and appropriate. *See In re AES Thames,* 2016 WL 11595116, at *7 (holding "[t]he data is sufficiently tested, reliable and [the expert's] opinion [based on the RMA data] is helpful to the Court."); *In re ITT Educ. Servs., Inc.*, 2021 WL 933984, at *9 (Bankr. S.D. Ind. Mar. 11, 2021) ("reliance on data obtained from RMA is both reasonable and appropriate for determining the relevant industry standards."); *Dietz v. Jacobs*, 2014 WL 1153502, at *4 (D. Minn. Mar. 21, 2014) (RMA is "a well-established source for credit information.")

The Debtors further assert that RMA discloses that its data serves "only as general guidelines and not as absolute industry norms." (D.I. 12 at 25 (citing A.59-117).) This argument also has been rejected by courts. As the court in *In re AES Thames* observed, while acknowledging the limitations of its data set, RMA makes clear that, "[f]or over 94 years, RMA's Annual Statement Studies has been the industry standard for comparison financial data." *In re AES Thames*, 2016 WL 11595116, at *9. The *Dietz* court also rejected this argument, noting that the same

24

document containing RMA's disclaimer language also touted RMA's data as "the 'most respected source' of industry information" and "the industry standard for comparison financial data." *Dietz v. Jacobs*, 2014 WL 1153502, at *4; *see also Blue Cross & Blue Shield,* 2013 WL 2434838, at *8 (declining to exclude expert testimony based on RMA data). The Debtors cite no decision holding that RMA data is unreliable.

The Debtors further assert that Mr. Toppi did not conduct a robust statistical analysis to determine whether the RMA data was representative of the industry as a whole. In support of that argument, Debtors contend that RMA discloses that its data may not be "fully representative" of a standard for a particular industry. D.I. 12 at 25. But the Third Circuit has rejected any requirement that a transferee asserting an ordinary course defense establish an absolute norm that perfectly represents the industry at issue, explaining that the defense does not require "that the creditor must prove the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausibly argue comprise the relevant industry." *Molded Acoustical*, 18 F.3d at 224. Medline need only establish that the payments it received fell somewhere within "the *range* of terms" that firms that are similar in some general way follow. *Id.* (quoting

*Tolona Pizza,* 3 F.3d at 1033 (emphasis in original)). I agree that the RMA data was sufficient for that purpose.

With respect to the Debtors' second argument, the Bankruptcy Court properly rejected the argument that RMA data was inadmissible "double" or "triple" hearsay. The Bankruptcy Court determined that the RMA data was admissible under Federal Rule of Evidence 803(17), which excludes from the rule against hearsay "Market Reports and Similar Commercial Publications." *See In re Center City Healthcare,* 644 B.R. at 213-14. "Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations" are not excluded by the rule against hearsay. Fed. R. Evid. 803. The hearsay exception for market reports is based on "general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate." Fed. R. Evid. 803 Advisory Committee's Note to Paragraph (17). The record supports a determination that the RMA data fell within this exception. First, the RMA data is a compilation of market data—"a compilation of the 'days to pay' data garnered from information provided to RMA from companies in the industry." *In re Center City Healthcare,* 644 B.R. at 213. Second, as established by the uncontroverted declaration of Shane Reed, Medline's Director of Credit, professionals in the industry routinely rely upon RMA data to determine market credit terms. (*See* B.110, Reed Decl. ¶¶ 5-13.) Moreover, RMA has incentive to maintain the accuracy of their data:

if it were not accurate, market participants would cease to rely upon it and RMA's

business model would collapse. I agree the RMA data was admissible under Federal

Rule of Evidence 803(17).

In sum, Medline established, through uncontroverted evidence, that at least

$1,297,376.50 of the Transfers were paid in a manner consistent with the broad range

of prevailing practices in Medline's industry, and thus protected from avoidance by

the objective ordinary course defense.

## B.    Medline's New Value Defense

The Bankruptcy Court concluded that Medline "presented credible evidence

that it provided new value to the Debtors of $4,064,050.97." *In re Center City

Healthcare*, 644 B.R. at 219 (citing B.226, B.447, Toppi Decl. at ¶ 21, Ex. 8 at 74).

Medline prepared an analysis that subtracted—on an invoice-by-invoice basis in

sequential order—the New Value Invoices from the $3,095,648.06 in Transfers that

fell outside of the more conservative Industry Range determined by Mr. Toppi. (*See*

B.78, SUMF ¶ 66; B. at 372, Toppi Decl., Ex. 7 at 104.) The net result of that

analysis was $0. (*See id.*) The new value provided by Medline to the Debtors, as the

Bankruptcy Court explained, was "more than sufficient to cover the preferential

transfers of $3,095,648.06 remaining after application of the ordinary course of

business defense." *In re Center City Healthcare*, 644 B.R. at 219.

None of the above was meaningfully contested by the Debtors. The only argument advanced with respect to new value in the body of the Debtors' Response to the MSJ below was that, if Medline were unsuccessful on its objective ordinary course defense, then mathematically Medline's new value defense might be insufficient to cover all liability. (B.485.) Notwithstanding Medline's arguments that the Debtors failed to contest Medline's new value defense and should be barred from expanding on arguments mentioned previously only in a footnote (*see* D.I. 14 at 45-47 (citing B.485, Response at 30 n.147)), those arguments would not require a different outcome. As the Bankruptcy Court explained, "[e]ven if the Court were to accept the assertions of Ms. Prill and deduct the service charges ($26,415.22), mis-numbered invoices ($210,053, 87), and new value provided outside the preference period ($539,523.93), the new value provided by the Medline is still sufficient to cover all of the remaining preferential transfers." *In re Center City Healthcare*, 664 B.R. at 219. Accordingly, the Bankruptcy Court properly concluded that the Debtors' evidence was insufficient to rebut Mr. Toppi's new value analysis so as to create a genuine issue of material fact.

## V.    CONCLUSION

Medline satisfied its burden of proving that there was "no genuine dispute as to any material fact" and that it was "entitled to judgment as a matter of law" that

objective ordinary course defense and the new value defense rendered the Transfers exempt from avoidance.[12]  Accordingly, I will affirm the Order in all respects.

The Court will issue a separate Order consistent with this Opinion.

---

[12] Based on the foregoing, the Bankruptcy Court also properly dismissed Counts III and IV of the Complaint.  Count III seeks only recovery of any transfers following avoidance.  Because none of the Transfers are avoidable, the Debtors may not recover on account of the Transfers.  Count IV seeks disallowance of Medline's claims, if any, against the estates unless and until Medline pays amounts owed with respect to any avoided transfers.  Again, because the Transfers are not avoidable, disallowance does not apply.